# STATE OF MICHIGAN

# COURT OF APPEALS

---

ZF CHASSIS COMPONENTS, LLC, formerly
known as ZF LEMFORDER, LLC,

       Plaintiff/Counter-Defendant-
       Appellant,

v

SAINT JEAN INDUSTRIES, INC,

       Defendant/Counter-Plaintiff-
       Appellee.

UNPUBLISHED
October 17, 2017

No. 332741
Oakland Circuit Court
LC No. 2014-143905-CK

---

Before: GLEICHER, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

This is a complicated contract dispute between an automotive parts manufacturer and a components supplier. The question boils down to whether defendant's actions amounted to an "Event of Default," triggering its duty to repay nearly $34 million in financial accommodations, and not merely a contractual breach. The circuit court determined that defendant's challenged acts did not fall within the contract's definition of an "Event of Default" and summarily dismissed plaintiff's action. We affirm.

## I. BACKGROUND

Defendant Saint Jean Industries (SJI) develops and manufactures component parts for automobiles. It sold components to plaintiff ZF Chassis Components to integrate into larger parts and also sold directly to General Motors and Honda of America. In 2011, a fire damaged SJI's facility, endangering its ability to furnish critical components to its customers. To prevent production interruptions, GM, ZF and Honda provided financial support to SJI, including loans and inflated payments for components. The parties executed an "Interim Funding Agreement" on December 9, 2011, and in the following years amended that agreement 18 times.

The dispute in this case centers on an "Accommodation Agreement" (AA) that went into effect on November 30, 2012. The document memorialized the ongoing financing relationship between SJI, GM, Honda, and ZF. Under the AA, GM agreed to refinance its existing loan to SJI and provide separate working capital and capital expenditure lines of credit. Collectively, the AA defines these loans as the "GM Loan." Under a separate "Participation Agreement," Honda and ZF agreed to participate in the GM Loan with ZF providing 47.5% of the funding, Honda

-1-

21.5% and GM 31.0%. The GM Loan was secured, in relevant part, by "the proceeds of the business interruption insurance claim relating to the losses due to FPO1 (forge press no, 1) (the "Insurance Claim Proceeds") to the extent such proceeds are not the collateral of an Existing Secured Creditor."

The AA was set to expire on December 31, 2016, "subject to earlier termination" under conditions provided in the agreement. One of those conditions, § 2.4, allowed GM, Honda and ZF to discontinue the business relationship with SJI and cease purchasing SJI-manufactured parts. The customers could "re-source" the components, meaning they would transfer their business to another manufacturer, no earlier than December 31, 2013. If the customers opted to end the relationship on December 31, 2013 or later, they would be required to forgive SJI's debt. If the customers opted to re-source because SJI committed "an Event of Default," however, SJI would be required to repay its remaining loan debt. "Event of Default" is defined in § 6.0 of the AA as follows:

> 6.0 Events of Default and Remedies. The following shall constitute Events of Default under this Agreement (each, an "Event of Default"):
>
> (i) a material breach by [SJI] under any Purchase Order or this Agreement, which will likely result in an imminent interruption of a Customer's operations;
>
> (ii) a material breach by [SJI] under any Purchase Order or this Agreement, which results in an interruption of a Customer's operations;
>
> (iii) a written repudiation of this Agreement or a Customer's Purchase Order(s) by [SJI];
>
> (iv) notwithstanding the GM Loan and this Agreement, [SJI] acknowledges that it has insufficient funds to maintain operations without additional accommodations from the Customers;
>
> (v) a default occurs and is continuing in respect of an obligation to an Existing Secured Creditor under agreements between [SJI] and such Existing Secured Creditor and, as a result of such default, the Existing Secured Creditor commences enforcement action against any real or personal property assets of [SJI] securing such obligation, which [SJI] does not contest within ten (10) business days of receipt of notice of such enforcement action;
>
> (vi) any third party commences an enforcement action against any of [SJI's] personal or real property, which [SJI] does not contest within ten (10) business days of receipt of notice from GM of such enforcement action; or
>
> (vii) any third party commences an enforcement action against any of [SJI's] personal or real property, which will likely or results in an interruption to a Customer's production.

On September 15, 2013, GM, Honda, and ZF notified SJI that they would re-source beginning January 1, 2014. In the notification, the customers expressly recognized their contractual obligation to forgive SJI's loans. GM, Honda and ZF warned SJI that in order to guarantee loan forgiveness, it would be required to continue supplying parts through the end of the year.

On October 1, 2013, two weeks after its customers revealed that they would be ending the business relationship, SJI received a $2 million payout from its insurance company. SJI had received other insurance payouts in the past and applied them to its loan balances. On November 7, another of SJI's creditors, GE Capital Corporation, demanded that SJI turn over the insurance proceeds. Under a loan agreement between SJI and GE Capital, SJI bore the duty of advising GE "of any damage or destruction of any Property or Collateral." SJI had not notified GE of the fire damage to its equipment, breaching its GE contract. Turning over the insurance proceeds to GE was "[a] condition precedent" to preventing the immediate maturation of the entire GE loan.

Just as SJI did not notify GE of its facility fire, it did not timely notify GM, Honda, or ZF that it received its insurance proceeds and paid them over to GE. SJI actually denied receiving the insurance proceeds when directly asked by financial advisors hired by GM, Honda, and ZF. ZF learned of SJI's transfer of its insurance proceeds to GE in February 2014. ZF did not demand return of the proceeds. Instead it reacknowledged SJI's right to loan forgiveness and negotiated its outstanding financial obligation to SJI. GM and Honda reached agreements with SJI and compensated SJI for remaining inventory. ZF continued to dispute the amount of its outstanding financial obligation and filed the current suit in Oakland Circuit Court, raising claims of breach of contract, unjust enrichment, silent misrepresentation, and seeking an accounting. ZF alleged that SJI's silence and subsequent transfer of the proceeds breached the AA. And as a result of this breach, ZF contended that it was not required to forgive SJI's debt.

In lieu of an answer, SJI sought summary disposition pursuant to MCR 2.116(C)(8). The circuit court dismissed all but ZF's breach of contract claim. ZF has not appealed that judgment. SJI then answered the breach of contract count and levied a counterclaim seeking payment of ZF's outstanding financial obligations, which the parties subsequently resolved by settlement. At the close of discovery, SJI sought summary dismissal of ZF's breach of contract claim under MCR 2.116(C)(10). SJI argued that the AA's loan forgiveness provision could only be negated if an "Event of Default" occurred. None of the "Event[s] of Default" described in the AA corresponded with SJI's actions, the debtor contended. In reply to ZF's brief in opposition, SJI further noted that ZF attempted to rely upon default provisions in GM's security agreement with SJI, not the AA. As a nonparty to the GM security agreement, ZF lacked standing to enforce its provisions.

The circuit court dismissed ZF's breach of contract action. The court acknowledged that the AA obligated SJI to disclose financial information to ZF, but found SJI's silence to be a simple breach and not an event of default as defined in the contract:

To the extent [ZF] is relying on [SJI's] failure to report the insurance proceeds as a breach under Section 6.0(i) or (ii), those provisions require a "material breach" that "will likely result in an imminent interruption of a Customer's operations" or in fact results in an interruption of [ZF's] operations. [ZF] cites no evidence that [SJI's] failure to reveal its receipt of the insurance proceeds interrupted or will interrupt [ZF's] operations. Moreover, [ZF] fails to explain how [SJI's] failure to disclose the insurance proceeds would constitute a "material breach" of the [AA]. A breach is material if the nonbreaching party did not obtain the benefit it reasonably expected to receive. *Omnicom of Michigan v Giannetti Investment Co*, 221 Mich App 341, 348; 561 NW2d 138 (1997). [ZF] presents no evidence that [SJI's] alleged failure to comply with financial reporting requirements prevented [ZF] from obtaining the benefit of its bargain under the [AA].

The circuit court also rejected ZF's argument that an event of default occurred when GE issued its November 7, 2013 notice of default against SJI because GE did not commence an "enforcement action" against SJI as required under § 6.0(v) of the AA.

## II. ANALYSIS

We review de novo a circuit court's grant of summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id*. at 119.]

We also review de novo issues of contractual interpretation. *Citizens Ins Co v Secura Ins*, 279 Mich App 69, 72; 755 NW2d 563 (2008).

To establish a viable breach of contract action, the plaintiff must prove "(1) there was a contract (2) which the other party breached (3) thereby resulting in damages to" the claimant. *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2013). "In interpreting a contract, our obligation is to determine the intent of the contracting parties." *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003). "If the language of the contract is unambiguous, we construe and enforce the contract as written." *Id*. "Thus, an unambiguous contractual provision is reflective of the parties' intent as a matter of law." *Id*. "Once discerned, the intent of the parties will be enforced unless it is contrary to public policy." *Id*.

We first reject ZF's attempt to establish SJI's "default" based on the "Loan and Security Agreement" executed between GM and SJI. The GM-SJI agreement defined certain "Event[s] of Default" that trigger an immediate repayment obligation. One such event occurred when SJI made a false representation or warranty. ZF contends that SJI made a false representation when

it expressly denied receiving $2 million in insurance proceeds when asked by the financial auditors. However, ZF was not a party to the "Loan and Security Agreement." And the "Amended and Restated Participation Agreement" provides:

> No Participant will have the right to enforce any of the Loan Documents including, but not limited to exercising any rights or remedies arising from the Loan Documents or any documents or agreements executed by the Borrower or provided for under applicable law. All rights, remedies, privileges, etc. with respect to the Loan and the Loan Documents may only be exercised by Lender without any requirement of consent or approval from Participants.

Accordingly, ZF had no authority to rely upon an event of default identified in the GM-SJI loan and security agreement and not in the AA.

SJI goes too far, however, in claiming that ZF has no standing to raise any challenge to the potential misappropriation of the insurance proceeds securing the GM Loan. The AA includes within its "Terms and Conditions" that the loan funded in part by ZF is partially secured by the subject insurance proceeds. Nothing in the AA requires ZF to forego its right to sue just because GM reached a settlement it deemed satisfactory.

Further, we need not resolve whether ZF would be entitled to its share of the $2 million insurance proceeds under a more straightforward breach of contract claim. In alleging breach of contract, ZF sought full repayment "in an amount no less than $33,943,173.00," essentially asserting that SJI was not entitled to loan forgiveness. ZF's silent misrepresentation claim recited a more general request for damages, but ZF has not challenged the dismissal of that count.

This leads us to the only issue actually before this Court. Section 2.4 of the AA provided that ZF was required to forgive SJI's loan if it decided to re-source the components provided by SJI. The only exception was if SJI committed an "Event of Default" as defined in § 6.0 of the AA. An "Event of Default" is not simply a contractual breach, or even a material breach. An "Event of Default" is one of seven specific acts.

Subsections (i) and (ii) of the "Event of Default" definition apply to "material breach[es]" committed by SJI. To excuse the loan forgiveness clause, however, the material breach must cause a certain impact: "will likely result in an imminent interruption of a Customer's operations" or "results in an interruption of a Customer's operations." We need not consider whether SJI's failure to notify ZF regarding its receipt of the insurance proceeds or transfer of those proceeds amounted to a material breach. ZF presented no evidence that SJI's action or lack of action interrupted or was likely to interrupt ZF's business. ZF's business continued on despite the lack of information and failure to payout its share of the insurance proceeds. Indeed, ZF had already notified SJI that it intended to move on to a new supplier before SJI received the insurance proceeds. Accordingly, SJI's breach was not even an impetus for ZF's decision.

Subsection (iii) would only come into play had SJI made a written repudiation of the AA or a purchase order. SJI made no such repudiation. Subsection (iv) covers a situation in which SJI "acknowledges" that its financial situation has eroded to a point that it can no longer

maintain operations unless the customers provide even greater accommodations. SJI continued manufacturing components for its customers through December 31, 2013, and did not request funding beyond the agreement.

Subsections (v), (vi), and (vii) only apply when a third-party or a secured creditor other than the customers involved in this transaction "commences an enforcement action" against any of SJI's real or personal property and SJI does not contest the action within 10 days. ZF argues that the circuit court interpreted the phrase "enforcement action" too narrowly as including only court collection actions. ZF urges that that the term "action" should be broadly construed to encompass GE's demand for the insurance proceeds in the face of SJI's default. We cannot read the contract in this broad fashion.

*Merriam Webster's Collegiate Dictionary*'s (11th ed), first definition of the word "action" is "the initiation of a proceeding in a court of justice by which one demands or enforces one's right; *also*: the proceeding itself." In the context of a complex legal contract drafted by attorneys and entered into by sophisticated commercial entities, reading the phrase "enforcement action" to mean anything other than a court proceeding to enforce a party's rights requires a stretch of the imagination. The plain meaning of "enforcement action" in §§ 6.0(v), (vi), and (vii) is a lawsuit to recover a debt. This conclusion is supported by the use of the words "commence" and "contest"—words that are used in connection with formal legal proceedings.

The UCC section cited by ZF does not support its contrary position. MCL 440.9607, dealing with remedies after default, provides alternative avenues for a secured party to collect a debt. One option is simply to "[n]otify an account debtor . . . to make payment . . . ." MCL 440.9607(1)(a). A second option is to "[e]nforce the obligation of an account debtor." MCL 440.9607(1)(c). The code section elsewhere uses the terms "collect" and "enforce" disjunctively. See MCL 440.9607(3)(a). Further, ZF cites no caselaw supporting its position that GE's November 7, 2013 letter informing SJI of its default could constitute "enforcement action." Accordingly, GE did not commence enforcement action against SJI and no event of default occurred under § 6.0(v), (vi), or (vii).

As no "Event of Default" occurred, ZF could not support its only remedial request—full repayment of SJI's debt after cancellation of the previous loan forgiveness. The circuit court therefore properly dismissed ZF's breach of contract action.

Yet, ZF further contends that the circuit court prematurely dismissed the case as SJI failed to turn over requested documents in discovery. "As a general rule, summary disposition is premature if granted before discovery on a disputed issue is complete." *Village of Dimondale v Grable*, 240 Mich App 553, 566; 618 NW2d 23 (2000). "However, summary disposition may be proper before discovery is complete where further discovery does not stand a fair chance of uncovering factual support for the position of the party opposing the motion." *Id*.

Discovery closed November 1, 2015. Although ZF argues that SJI failed to comply with discovery, the allegedly withheld documents relating to the insurance proceeds and SJI's dealings with GE would not have changed the outcome of the summary disposition motion. As noted, while SJI's conduct may have breached its contractual duties, it did not fit within the

definition of an "Event of Default" necessary to support ZF's requested relief. Earlier receipt of this evidence could not have changed the result.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle